# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 24, 2010

## JAMES W. VANOVER v. STATE OF TENNESSEE

### Direct Appeal from the Criminal Court for Knox County
### No. 91887    Mary Beth Leibowitz, Judge

---

### No. E2010-00203-CCA-R3-PC - Filed August 19, 2011

---

Petitioner, James W. Vanover, was convicted following a jury trial, for one count of rape of a child, a Class A felony, and two counts of aggravated sexual battery, a Class B felony. He was given an effective sentence of 36 years. On appeal, this Court affirmed the convictions but remanded for resentencing. *State v. James Vanover*, No. E2005-01192-CCA-R3-CD, 2006 WL 521496 (Tenn. Crim. App. March 2, 2006). Upon resentencing, he was again sentenced to serve 36 years. On appeal, this Court held that the trial court properly ordered consecutive sentencing at the second sentencing hearing. *State v. James Vanover*, No. E2006-01342-CCA-R3-CD, 2007 WL 2323386 (Tenn. Crim. App. August 15, 2007) *perm. app. denied* (Tenn. July 7, 2008). Petitioner timely filed a petition for post-conviction relief, alleging that he received ineffective assistance of counsel. Following an evidentiary hearing, the post-conviction court denied relief, and Petitioner appeals. After review, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Albert J. Newman, Jr., Knoxville, Tennessee, for the appellant, James W. Vanover.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Randall E. Nichols, District Attorney General, and Kevin Allen, Assistant District Attorney General or the appellee, the State of Tennessee.

**OPINION**

## I. Background

In Petitioner's original appeal from his convictions, this Court summarized the facts forming the basis of the convictions. These facts are set forth below, with initials used where necessary to withhold the identity of the minor victim, and with Petitioner referred to as "defendant" as he was in the original proceedings:

This case relates to the defendant's unlawful sexual conduct with the victim, a child under the age of thirteen at the time of the offenses. At the trial, [T.D.W.] testified that she was the victim's aunt. She said that she lived on Deaderick Road and that most of her immediate family, including the victim, also lived on Deaderick Road. She said she knew the defendant because he had been dating her sister, the victim's mother. She said the defendant often would stay with the victim and her mother. She said that she was very close to the victim and that she spent a lot of time with her.

[T.D.W.] testified that in October 2001, she noticed a change in the victim's behavior. She said the victim was not as happy, "and she would just hang her head down like she [was] worried about something." She said that she asked the victim if anything was wrong and that the victim began crying. She said the victim told her what was wrong.

[T.D.W.] said she was present the following day at the hospital. She said she stayed in the room with the victim while the doctor examined her vagina. She said the victim was very upset and scared.

On cross-examination, [T.D.W.] acknowledged that she never thought the defendant was an appropriate boyfriend for her sister. She admitted asking the victim on one or two other occasions if "something funny wasn't going on with her[.]" [T.D.W.] denied telling a representative of the Department of Children's Services that she did not trust men around the victim.

The victim testified that she was twelve years old. She said that she called the defendant "dad" when he lived with her but that most people called him "Bug." The victim said the defendant began touching her "private parts" when she was six years old. She said he would normally rub her vagina. She said that on many occasions, the defendant would "either put his hand down there

under my clothes or take my hand and put it under his clothes." She said the defendant made her touch his penis.

The victim testified that on one occasion, she was sitting on top of the defendant in her nightclothes when he "unbuttoned his pants, and he put his penis into my vagina halfway but not all the way, because I got off of him, and I said I had to go use the bathroom...." She said that after her brother moved away from home, the abuse got worse because she was left alone more often with the defendant. She said that she did not know how many times the defendant touched her but that it was quite a few times. She said she thought she touched the defendant more times than he touched her.

The victim testified that on another occasion the defendant came into the bathroom while she was taking a shower, pulled back the shower curtain, and said, "Let me see you." She said she could not remember if her mother was home but thought she was in the living room. She said that later that night, the defendant told her if she refused to get on top of him underneath the covers, he would kill her mother. She said the defendant stuck his penis in her vagina, but again only halfway. She said he stopped because her mother was coming into the adjacent room. She said the defendant's raping her hurt. She said she did not tell her mother because she was afraid the defendant would kill her mother. She said she told her aunt what happened a few weeks later because she did not want it to happen again.

The victim testified that she specifically remembered touching the defendant's penis while in his camper, which was parked outside their house. She said she specifically remembered the defendant touching her vagina in his camper just before her mother walked in with some pillows. The victim said she never told anyone about the defendant's touching or raping her because she was afraid he would hurt her or her family. The victim said she was not mad at the defendant for any other reason.

On cross-examination, the victim acknowledged that every time she went to her aunt's house, her aunt would ask her about the defendant and if anything was wrong. The victim maintained that the defendant inserted his penis into her vagina on two separate occasions. The victim admitted telling a worker from the Department of Children's Services that the defendant had on one occasion tried to put his penis inside her. She explained, however, that the discrepancy between that statement and her trial testimony was based upon her

understanding things better as she got older. The victim admitted that she did not bleed when the defendant put his penis inside her vagina.

Dr. Jerrod Michael Connors, a pediatric emergency physician at East Tennessee Children's Hospital, testified that he examined the victim. He said that during his examination, the victim told him that her stepdad had touched her in her private area. He read the following statement of the victim to the jury:

> I was seven, lived in Deaderick, and [the defendant] made me look at his penis. When we lived on Asbury, he tried to make me look at his thing, did lots of times. Did not touch me; I did not touch him.
>
> Since we were at this house, we were on the way to the store and we went back roads. Pulled private out and asked me to see it, and I wouldn't, so put it back in his pants.
>
> A couple of days later, I was in bedroom and listening to music. I think mom was asleep. He came in there and asked if he could see my private. I wouldn't let him.
>
> A few days later he tried to hold me down. He put his private ... put halfway in my vagina, put in halfway and took it out. And then left and went downstairs. Keeps asking me to see his privates.

Dr. Connors said he found the victim's hymen to be abnormal due to an opening in the hymen. He said, however, that subsequent medical literature suggested that the opening was not necessarily indicative that a penis or a tampon had pierced the hymen. Dr. Connors testified that he could not be certain whether the victim's hymen had been pierced. On cross-examination, Dr. Connors admitted that it was very hard to prove that a sexual penetration did not occur. He said that when a sexual penetration would occur, the results of a medical exam would normally be inconclusive.

The defendant testified that when he first met the victim, she was a baby. He said he thought of the victim as a daughter based upon his relationship with the victim's mother. He said that he never touched the victim inappropriately, that he never asked the victim to touch him inappropriately, and that he never raped

her. The defendant said he did not know why the victim was making false allegations against him and denied ever threatening the victim or her family.

*State v. James Vanover*, 2006 WL 521496, at *1-3.

## II. Post-Conviction Hearing

Petitioner testified that he was held in jail in lieu of bond between his arrest and trial. Prior to trial, counsel came to meet with him two or three times for about an hour at each meeting. Petitioner testified that his defense at trial was that he was innocent of the alleged crimes. He did not recall whether trial counsel filed any pretrial motions, or whether counsel informed him that no physical, scientific, or forensic evidence existed showing his guilt. Petitioner could not recall exactly what trial counsel had discussed with him. Petitioner reiterated what he had maintained at trial: that the victim's aunt had "put [the victim] up to" testifying against Petitioner. Petitioner advised his trial counsel of this defense, and Petitioner believed trial counsel understood this defense. However, Petitioner testified that trial counsel's cross-examination of the victim and her aunt was not "good." Petitioner did not testify as to any specific shortcomings of trial counsel's cross-examinations.

Petitioner testified that trial counsel "failed to rep – represent me right," but when asked "why," Petitioner testified "I don't know." Petitioner did clarify that while trial counsel failed to properly cross-examine the victim and her aunt, trial counsel did prepare Petitioner for his testimony at trial.

On cross-examination, Petitioner agreed he maintains that trial counsel failed to cross-examine the aunt regarding the aunt's coercion of the victim to testify falsely and that trial counsel failed to adequately cross-examine the victim about being coerced by the aunt to testify falsely. Petitioner further admitted that trial counsel was appointed to represent Petitioner only two months before trial and that even though trial counsel said he needed a continuance of the trial to better prepare, Petitioner refused to agree to a continuance and insisted on going to trial as scheduled. Petitioner also acknowledged that he rejected a negotiated plea agreement offer from the State to receive an effective sentence of twelve years. He rejected the plea offer because he maintained then and continued to maintain that he was innocent.

Trial counsel testified that his primary legal practice is in criminal defense, and he has been practicing criminal law about 22 years. Trial counsel testified that he was appointed to represent Petitioner less than two months prior to the scheduled trial date. Despite the fact he told Petitioner that more time was needed to adequately prepare for trial and that they should request a continuance, Petitioner refused to allow trial counsel to do so. In fact,

Petitioner demanded to go to trial at the first opportunity. Trial counsel testified that there was no forensic, DNA, or other physical evidence linking Petitioner to the commission of a crime. Furthermore, before trial, counsel met with the physician who examined the victim and testified at trial. Counsel knew from this interview that the physician "could not make a statement to a medical certainty that [sexual abuse] had happened."

Trial counsel knew before the trial that an employee of the Tennessee Department of Children's Services had interviewed the victim. Counsel did not speak with the interviewer, but did have the report. Trial counsel also admitted that he was probably aware prior to trial that a prosecutor had interviewed the victim on two or three occasions. Trial counsel indicated that he did not think it was necessary to file a pre-trial motion for a "chain hearing" to determine if the victim's testimony had been "shaped" by her aunt, the Department of Children's Services employee(s), or by a prosecutor. Trial counsel testified that he prepared Petitioner for his testimony.

Trial counsel agreed that the defense theory was that the aunt put the victim up to testify falsely against Petitioner. Trial counsel acknowledged that he objected to the physician's testimony reciting from his examination report of details of the alleged abuse, based upon the testimony being hearsay. The objection was overruled. Counsel confirmed that Petitioner rejected the plea offer to serve twelve years because he maintained his innocence. Counsel testified that he tried to get Petitioner to agree to a request for a continuance in order to better prepare. Petitioner refused the request. Counsel pursued the defense theory that Petitioner insisted was true: the aunt pushed the victim into making up the allegations of criminal conduct by Petitioner.

## III. Post-Conviction Court's Ruling

The post-conviction court took the matter under advisement after the evidentiary hearing and subsequently filed an order denying post-conviction relief. In this order the post-conviction court accurately summarized the testimony of the two witnesses at the hearing, Petitioner and his trial counsel. The post-conviction court also stated on the record that the entire transcript of the trial, a copy of which was made an exhibit at the hearing, would be read and reviewed prior to ruling on the petition.

The post-conviction court's order contains the following factual findings and conclusions of law:

> [Petitioner's] claims regarding innocence have not been raised by any proof other that [sic] his statement. [Petitioner] further had counsel which met the obligations of <u>Baxter v. Rose</u>, 523 S.W.2d 930 (Tenn. 1975) and <u>Strickland</u>

v. Washington, 466 U.S. 668 (1984), more than adequately, and who within two months mounted a defense to a case because [Petitioner] insisted on doing so and met with him on several occasions, as well as prepared with an investigator for trial. [Trial counsel] did effectively cross-examine the witnesses, including the child, as well as the aunt, [T.D.W.], and the case came down to the jury believing the child's version of the story over that of [Petitioner], who cannot now recall that in fact the child was approximately nine years old when she testified.

These allegations do not rise to the level of ineffective assistance of counsel and the constitutional rights of [Petitioner] had [sic] not been denied in this case. The petition is therefore respectfully denied.

## IV. Analysis

On appeal, Petitioner argues that he is entitled to post-conviction relief because he received ineffective assistance of counsel at trial, and because he is actually innocent of the criminal charges for which he was convicted. As to the "actual innocence" claim, Petitioner concedes that this theory of relief is not cognizable pursuant to post-conviction relief in his case because his claim is not based on scientific evidence. *See Dellinger v. State*, 279 S.W.3d 282, 291 n. 7 (Tenn. 2009) (claims of actual innocence which are not based upon new scientific evidence may be brought by a petition for writ of error coram nobis, or, pursuant to certain conditions in an application for executive clemency). Petitioner does not further argue his claim of "actual innocence," and we conclude he is not entitled to relief on this claim.

Regarding his claim of ineffective assistance of counsel at trial, Petitioner asserts in his brief the following as examples of deficient performance by his trial counsel:

(1) Counsel performed ineffective cross-examination of the victim and her aunt; and

(2) Counsel should have filed a pre-trial motion "to attack the [victim's] trial testimony as being not her own, but a product of undue suggestions and pressure" applied by the aunt, the State Department of Children's Services employees, and the prosecutors.

To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. *See* Tenn. Code Ann. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review,

this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. *See Momon*, 18 S.W.3d at 156; *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. *See Momon*, 18 S.W.3d at 156; *Henley*, 960 S.W.2d at 578.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Burns*, 6 S.W.3d at 461; *Baxter*, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. *Id*. at 687; *Burns*, 6 S.W.3d at 461. To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *Burns*, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. *Burns*, 6 S.W.3d at 461; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." *Strickland*, 466 U.S. at 688; *Burns*, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462; *see also Strickland*, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics*, see Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be

judged in light of all the facts and circumstances as of the time they were made, *see Strickland*, 466 U.S. at 690; *Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. *Id*. "However, a trial court's *conclusions of law*—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely *de novo* standard, with no presumption of correctness given to the trial court's conclusions." *Id*. (emphasis in original).

In support of his argument, Petitioner asserts that counsel knew the victim had been interviewed by employees of the Department of Children's Services and the District Attorney General, and that the aunt had extensively questioned the victim, but trial counsel failed to personally interview any employee of the Department of Children's Services who interviewed the victim.

Petitioner submits that trial counsel could have honored Petitioner's desire that the trial not be postponed at all, and still file a pre-trial motion "to allow [ ] the court to rule [ ] if the trial testimony of the child had been tainted by the child's interviews with [the Department of Children's Services] and the prosecution['s] office." Petitioner further argues that doing this would have "allowed counsel a greater and more in depth examination of the State's case, and the trial testimony of the victim and her aunt."

We are unable to conclude that Petitioner's trial counsel rendered deficient performance by failing to file the pre-trial motion Petitioner urges counsel should have filed. However, even if we assumed, *arguendo*, that trial counsel's inaction was deficient, Petitioner failed to submit any proof of prejudice. It is well settled that when a post-conviction petitioner claims ineffective assistance of counsel by trial counsel's failure to call witnesses at trial, those witnesses should testify at the post-conviction hearing. *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). "'As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" *Id*. (quoting *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Petitioner did not present the proof at the post-conviction hearing that he claims his trial counsel should have presented pre-trial. Thus, we would have to rely on pure speculation as to what the purportedly critical proof would show.

In addition, the same problem exists for Petitioner on his claim that trial counsel rendered ineffective assistance of counsel during the cross-examination of the victim and her aunt. He did not offer significant proof at the evidentiary hearing of what additional questions or subject matter should have been added to or deleted from the cross-examination that was done. In his appellate brief, Petitioner limits his argument on this issue to the fact that the cross-examination of T.D.W. included only "about five (5) questions" concerning her interaction with the Department of Children's Services, the physician's appointment with the victim, and T.D.W.'s disapproval of Petitioner dating T.D.W.'s sister. As to cross-examination of the victim, Petitioner states that trial counsel only asked "about (5) five [sic] questions" concerning her interviews with the employee of the Department of Children's Services and her conversations with the victim's aunt. Petitioner goes on to assert that trial counsel failed to ask the victim any questions about the medical examination, the physician's statements, or her interviews with the prosecutor. Significantly, Petitioner does not offer any specific examples of questions that should have been asked or cite to the record where these missing questions were mentioned at the post-conviction hearing.

We have reviewed the transcript of the cross-examinations of the victim and her aunt. We agree with the post-conviction court that trial counsel effectively cross-examined these witnesses. Petitioner is not entitled to relief in this appeal.

## CONCLUSION

After a review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE